The 6th division, the Honorable Justice Sanjay T. Taylor presiding, case number 23-1340, People v. Martin Hill. Good afternoon. My name is Sanjay Taylor. I'm the presiding judge of the 6th division, First District of Belmont Court. If you are not participating in today's argument, I would ask that you mute yourself. You appear to have some feedback. Do you folks hear the feedback? I do. Okay. I'll take care of it, Justice Taylor. Hold on one second. Okay, you're all set. Thank you. Each side will have 20 minutes to present their argument. The reserve for rebuttal. And let me ask the parties or counsel to represent themselves, starting with the appellant. So, I'm Gonzales. I represent the appellant, Martin Hill. I only need about five minutes for rebuttal. Okay. Thank you, Mr. Gonzales. Good afternoon. Assistant State's Attorney, Amari Dawson for the people of the state of Illinois. Good afternoon. Mr. Gonzales, you may proceed. Thank you. May it please the court, counsel, 15-year-old Martin Hill's 1998 conviction rests almost exclusively on the testimony of two witnesses, Ratliff and Crudup, both of whom were 14-year-old wards of the state at the time, both of whom smoked alcohol-laced blunts on the night of the shooting and gave various accounts of events throughout the course of the investigation. Now, the various accounts before and during trial are outlined in the brief, but I'd like to focus on a few of the most significant ones that pertain to the question of whether another jury probably would reach a different result given both the old and the new evidence that was presented at the evidentiary hearing. Of course, the ultimate question is whether the newly discovered evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. In determining whether what another jury might do after considering both the old and the new, it's probability that's the key, not certainty. Of course, we know at least one other jury reached a different conclusion based on even stronger evidence, namely Ranson's jury, who basically heard almost the identical evidence on top of Ranson's own statement, who basically confessed that he was one of the gunmen. So, looking at the old evidence in turn... Let me ask a question. The best new witness, I mean, Ratliff, to me, what she has been saying, she says now she wasn't present at the scene, so how can she credibly say that Hill wasn't the shooter? Admittedly, she gives different accounts. She gives one account in her affidavit. But now she's saying, I didn't see it at all. So, how can she... What value is there in her statements now? I guess, assuming that we take that as true, she wasn't even there, she knows nothing about it. Well, if nothing else, it certainly undermines what she said at trial. She was one of the key witnesses at trial. She was one of the eyeballs that said, I saw the shooter from the passenger side shooting out of a maroon car. So, if nothing else, her saying, I didn't see anything, I wasn't there, it still establishes the fact that, well, it undermines or undercuts her trial testimony, which is a key part of the state's evidence. In fact, the entirety of the state's case, almost the entirety of the state's case, came down to the testimony of Ratliff and Crudo. And their testimony that they saw this car initially, and this is important because they testified that they're entering this play lot. And of course, the map is part of the record and the way it's laid out. There's this description of... It's basically the school that's in Washington. There's a play lot behind it. It's on the west side of Washington. There's a gate that runs basically from the back of the play lot, which I think almost a buck's warrant, runs all the way up towards the front of the school. So, they say that they were walking north when they saw the maroon car initially going south, or I'm sorry, going north on Washtenaw. And then they say, well, Wilson was in the driver's seat, Martin was supposedly in the front passenger seat, and Ranson was supposedly in the backseat behind Martin. So, then it circles back, turns west on Washington, circles back through the alley, heads back south towards the Dan Buick. And as they're entering or exiting this play lot, which again, if you picture the diagram, it's even closer north or further north, closer to Washington. They hear the shots, they look to where the shots are coming from, they see the flashes coming from the gun, or coming from the car, side of the car from where Hill was supposedly sitting. All right. Well, back to your question about, well, if Ratliff says I wasn't there, well, that pretty much undercuts that entirely. She couldn't have seen it because she wasn't there. So, now we're left with Crudup's testimony. Well, her testimony is shaky in its own right, right? Yeah, again, she testifies pretty much consistently with what Ratliff says. She says, yeah, I was walking with her, again, after a night smoking blunts. We were on our way to the VOA home, same thing. She hears shots, she looks back, she supposedly sees flashes coming from the passenger's side of the car, presumably where Ranson and Martin Hill were sitting. But again, when it comes to Crudup, she admitted to defense counsel, she admitted to the defense team that she was actually in the doorbell to the VOA home when she heard the shots, and then she looked back. And now this is important, too, is that the VOA home, if you look on the diagram. Mr. Gonzalez, I feel like you're retrying the case. I've got an issue with respect to Ratliff's new testimony. The undisputed testimony and story of both Crudup and Ratliff was they were walking together. And we still have Crudup saying, we're walking together, right? We don't have a different affidavit now. Ratliff now says, oh, I just was testifying to the story that I heard. Except Ratliff's testimony, as repeated in the original appellate court decision affirming this case, talks about Ratliff saying, I was there. I was walking. She gives a very, very detailed account as to the car's whereabouts, the transportation pattern. That was not something that Crudup testified in detail to. That's something that Ratliff independently knew on her own. She didn't say, this is what I was told. She said, this is what I saw. This is what happened. Now, 20 plus years later, she comes back and she says, oh, no, I wasn't there. Oh, I was at the home. I wasn't even walking. Like, how do we reconcile that? Why should we give that any additional credibility whatsoever? Again, I think the main import of what she's saying now is, and I agree, she was more detailed than Crudup was in terms of all of those things he had mentioned, the details and whatnot. But it still undermines everything. It erases everything she said at trial. She just said, no, it's not true. Isn't that true only if she was found credible? And we have a trial judge who made specific credibility findings at that third stage of hearing saying she wasn't there. But that was based on, I think that was based in part on, he gave a lot of detail about just the timing of it. Just the fact that it was just a recantation and how unreliable recantations are. But in this case, she's the one that didn't have a motive to lie. She didn't want to come forward to begin with. She was very reluctant. Neither did Crudup. Crudup didn't come forward. I'm sorry. So my understanding was that together, they decided we're not going to say anything. And they only said something when they got picked up later was for some violation. Okay. I'm still making sure I'm understanding you. So, yeah, initially, back in 1998, yeah, they didn't come forward right away. And they both, I think to some degree, as you mentioned, they didn't want to take it or maybe they did get ticketed for curfew violations. Okay. But fast forwarding to the 17 and 20 plus years to the time of the affidavit or the testimony. Again, it's Ratliff saying, well, no, I mean, I didn't learn of this. I wasn't even there. I didn't witness this. And again, I think the main import of that, two things. Number one, you know, this idea that I understand the court found her not credible. But again, it was based mostly on this idea that number one, it's a recantation, and number two, that it occurred 17 and 20 years later. But my response to that is, but again, she reluctantly came forward on her own. She had successfully mothered two very successful adult kids. She had no axe to grind at this point. And she's not the one, unlike Crudup, who basically used to date him. They got in this big fight the night before the shooting. I'm not sure how big of a fight it was. The testimony of Crudup was they broke up because he asked her for money that she wouldn't give him. And they were still talking. So the idea that there was this huge hubbubaloo, she was already moved on. She was dating somebody from the same gang, and they were talking. And in fact, Ratliff said she was still friends with Hill until she moved away long after this. So, you know, I would think that these young women at the time did not want to get these guys in trouble. They were friends. They were part of the same gang. They were dating gang members of the same gang. It wasn't like a rival gang. So the idea that there was like this motive to lie wasn't some like big tumultuous breakup over another person. I mean, Crudup's own story said, we broke up. I was dating somebody else. He asked me for money. I didn't give it to him. And we're still talking. I didn't see anything about some big explosive motive from her. Just to follow up on that question, Mr. Gonzalez, what motive did Ratliff have to lie? I understand your argument about Crudup, but what about Ratliff? What motive did she have to lie in her trial testimony? Again, in the trial testimony, yeah, I can't sit here and like give anything tangible because none of that came out. All right. But like, I guess I'm still stuck on this, you know, what she testified to 20 years later, which is what the court discounted. Because this is now after she's led a successful adult life and basically, albeit reluctantly, came forward and said, no, I'm going to correct what I said back in 1998. But no, I didn't see it. I wasn't there. I'm only relayed on it. Do we give more weight to her testimony because she has led a successful life? She's been educated, highly educated. She's raised two children that are highly educated. To give her testimony at the evidentiary hearing, more weight because of that? I certainly think the maturity certainly adds to her credibility. And the fact that she, again, she almost had to be dragged in. I mean, she wasn't doing cartwheels to appear, which is why she appeared a little bit combative at times. But yeah, so I do think that actually lends to her credibility. And circling back to Crudup and how it relates to Crudup, I think it's highly important now because if we add on, if we add what Ratliff is saying now against the old evidence, first of all, if we just eliminate Ratliff altogether, because again, her new testimony now is I didn't see it. How can I implicate or how can I say anything about her one way or the other if I wasn't there? Okay. Well, then that leaves us with Crudup. Well, what did Crudup say at trial? What would a new jury hear? Okay. They would be left with her and her alone. And again, what we have at that point is Crudup basically saying, I was walking north. I heard the shots coming from a car. I looked towards the direction of the car and I saw shots coming from a certain position of the car where he was supposedly sitting. But I want to add to this because this part is important too. There's this whole question about whether or not the shooters were actually in the moving car or whether they were on foot. So Vincent, who admittedly at trial said, I didn't see it because I was ducking down. The one thing he was, he initially started shaking on, but when he came around, he was pretty, he consistently maintained at the end of the day, like, no, the shooters were on foot. Yeah. I didn't see their faces. I was crouched down, but I see that I saw them approach a car. They were on foot. And the witnesses now going back to the evidentiary hearing. So we not only have Bratliff, we also have Jake Vincent, who submitted his own affidavit, who gave his own evidentiary testimony. And admittedly, there's some problems with it, but the most significant part of it. But you also have Donahue, who was preposterous, wasn't it? It's so unbelievable. Maybe. Doesn't that cast doubt on the entire case? I don't believe so, because it does two things. One, it again establishes that, even if he doesn't know exactly who it was, first of all, they both said it was Byron and various nicknames that he went by, but basically it was Byron Logan. Who is now dead, correct? So now the blame is cast on two individuals who are dead. It's cast on two people other than him. And two people who are now dead. And so nobody's going to complain that they're getting tagged for this incident. But I would add to that, I would, my response to that is also, again, the second part of that, which is the one thing that these two witnesses did, both Donahue and Vincent, is they established that the shooters were on foot. But the jury has heard that. Vincent said that at trial, correct? Yes, he did. But if a new jury now hears that on top of, now remember, if a new jury would, you know, Ratliff would be canceled out, would say, well, I didn't see it. We're left with very shaky Cuda, who claims that the shots came from a moving car, even though she admitted to defense counsel that she didn't see any flashes coming from the car, which actually adds more support to the idea that it could not have occurred the way that they described it. Now we have Donahue and Vincent, if we now look at their new testimony, they both insist that the shooters were on foot. And that, whether it's, you know, the dead people or whether it's somebody else, it's somebody that's not him. So I think the idea that the question of whether or not the shooters were actually shooting from a moving car or whether they were on foot is highly significant, because that was pretty much, that was the entirety of the state's case. How about the fact that there is difficult as evidence to corroborate the fact that this was from a car that pulled up behind, because the shot came from the back and the foot people were next to the car, right? Wasn't there physical evidence that this shot came from behind, and that's where the car was from behind, and the people on foot were next to the car, and that's not where it was shot from? Look, I understand your question correctly. There's, I don't think that's necessarily the case, and I know this didn't come out, but Antoine Chapman gave that, gave a statement prior. This case took all kinds of twists and turns in investigation, focused on different theories and whatnot, but one of them was that, again, the gunman on foot, one of them hanging over the trunk and shooting through the back window, and one of them shooting through the passenger side windows. Now Vincent did say, didn't actually testify as much, basically said, yeah, the shot that hit me in the back of the head came through the back window. So, no, that could easily be supported if the two gunmen were on foot, one of whom hung either, whether he hung over the trunk or whether he was situated behind the car, and whether the second guy was running towards the side of the car. In any event, it's just as likely, if not more likely, that given the damage to the car, one, you know, shot through the back of the window, through the side window, it actually, it would have been committed by two gunmen on foot. What about the other testimony of the investigators who testified at trial as to what they were told about the shoot? Well, they testified to various things, of course, but I'm not quite sure what you want to zero in on, but they intervened, of course, Ratliff and Crudup, and at least the defense investigators did, at least with respect to the defense investigators. Again, we have the statements from Ratliff, and she denied on cross, that she was just told that she didn't actually witness the shooting, which is what she basically said in her affidavits and her testimony, I didn't see the shooting. And then Crudup tells the defense investigators that, well, okay, I saw three guys in the car, but I don't really know who was sitting where, and I didn't really see the shots as they were fired because I was a block further north, I was a block away. She could not have seen it from that vantage point. That's almost an entirely city block. Let me shift gears. Let's assume that that's true, and we ignore Ratliff, what she said. There was another theory, there was this accountability theory. And, you know, your client admits that he was in the car, there's no question that he was in the car. There might have been a question as to where he was seated and whether he shot. But how about what happened on his first appeal and what the appellate said? That accountability was there, it was basically proven. The instruction was given, he was in the car, he still hung out with these guys at the end of the day, they went there with the intent to shoot his rival gang. I mean, if the jury found him guilty based on the accountability theory, then none of this new evidence matters, because none of that changes. Yeah, okay, my response is twofold. First, my recollection of the direct appeal is that that specific question, that specific challenge was not raised. In other words, whether or not the evidence sufficiently proved he was accountable, right? It was discussed in various degrees as far as the weight of the evidence, but as far as, like, a full-blown reasonable doubt based on accountability, I don't believe that was part of the discussion, if my memory serves. I would just say on that theory now, you know, and I think, again, a new jury, that they would certainly, that's pretty much all they'd be pretty much left with. And there's just no evidence of that. None. The state doesn't even try to offer any, because all Hill says, he gets two oral statements, and all he says is that he was walking west on Washington Door at the VOA home to meet a couple girls, and a car driven by Leon Jones, who just happened to be the guy that Kudo was sitting at the time, um, rolled up on him, approached him, and Wilson, an older cohort, ordered him to get in the car, and Hill complied. Hill, by the way, at 15, was the youngest of the group. So, he complied, got in the backseat. He sat behind the driver. All right? So, that was his statement there. And that's it. Yes, he admitted to having a revolver, but again, the evidence, especially the new evidence, it would get into a question about accountability. If the shooters were on foot, where's the accountability? I mean, I don't see the accountability, because really, it's basically just his mere presence in the car. There's no evidence that he was part of any preconceived plan to shoot up rival gang members. There is literally nothing of that sort. Mr. Gonzalez, if you're saying that the specific question of the sufficiency of the evidence to prove accountability was not raised on appeal, does that, does the doctrine of law of the case apply here, so that the accountability conviction is sufficient under that doctrine? No, that it would be, because I don't, if there was no, if that wasn't part of the issue raised, or if that wasn't what the court spoke to, I don't know how that would apply. Well, the court speaks for three pages on it in the original appeal. I stand corrected. Okay. And they talked about it in the context of admissibility of evidence, but it talks about it and has pretty robust discussion, saying all of these things that I just repeated about still being there, admitting he's there, still hanging out with his crew, didn't come forward. And so, even so, that was, you know, something that the jury reasonably could have hung its head on. But let me, go ahead. I was going to say, but again, that was such a small part of the state's case. It really was, it was almost an afterthought. I mean, you look at the entirety of the record, you look at what the state argues, it really was, it was almost an afterthought. Their main theory by far was this idea that he was one of two gunmen who shot from a moving car. I mean, that's pretty much the crux of it. So, if now we consider this new evidence against the old, I mean, there is a reasonable likelihood that a new jury could probably reach a different conclusion. Again, Ransom's jury certainly reached a different conclusion on a much stronger case. Ransom himself admitted that he was one of the gunmen. He went even further and said he wouldn't participate in the shooting because he was a punk. All right. So, now that he'll, now that Ransom's been acquitted, presumably at a new trial, he'll be able to at least attempt to call Ransom in his defense. So, let me follow up with regard to what was stated in the Rule 23 opinion that came out some 20 years ago. And it says with regard to this accountability, this evidence included the physical evidence that two guns had been fired. Okay. We know there were two guns. And we also know that the gun that Hill had was not the gun that was used because it was a .32 and the testimony was it was a .36, .44, or Magnum bullets. So, it could not have been his gun when he said he did not shoot it. So, first is the physical, there were two guns had been fired. Vincent's testimony that he was a black disciple and that he believed the shooters were on foot. There it is right there back then. So, again, now it's confirmed again. Detective O'Grady's testimony at the hearing on defendant's motion to suppress evidence that Brenda Davis told the police she saw two men on foot shoot at the car and then flee. And that Regina Bedgood told the police that she saw two men run from the scene immediately after she heard some shots. Other than these two factors, no other trustworthiness of that statement. But that's back then. But now go forward. This is what you've been saying. I'm trying to put it in context. Because you're saying the idea that this was not done from a car is also substantiated by a call up. Because in her testimony, she testified she never saw a gun in anyone's hand and stated that at the time of the shooting, and I'm reading from the decision again, she was looking at the side of the car where the guns were coming out. She later stated that she never saw the windows rolled down and never saw guns come out of the windows. So, we have all this testimony that this may have been fake. And we also have in the record that Ratcliffe said that she was told that the breakup that Justice Gamera was talking about was a really bad argument. Not just she called it a bad argument. And apparently she was dating somebody who may not have been in the car. And she wanted to get back at Hill as part of the information here. So, how does that all roll up into your argument? Some of that that you were referring to, some of that's from the pretrial hearing, right? Some of that's from the pretrial hearing as opposed to the trial itself. The one reference was Brenda Davis. That part was from the trial where the detective said, yeah, I interviewed Brenda Davis. She was the one that called 911. She's the one, the only one that remained at the scene and talked to us. And she said, I saw two gunmen fire into the car and that they were on foot. Okay. So, but again, first of all, Brenda Davis didn't testify. And neither did those other witnesses. So, again, the question. But the fact is now we have somebody saying reckless, I lied, right? That it was a car. We have Vincent saying it wasn't a car. We have Carlos testimony at a time saying, you know, she doesn't see any windows down or anything else. And we have somebody angry at Hill. Want to get back at Hill. You know, what happened here? There seems to be two stories. And as I understand the testimony now is that there were several meetings between the ASA and Radcliffe to get her testimony straight, to make her the story. What she said was not her story. She was just repeating what she was told. Isn't that something significant that needs to be heard by, so we have a jury hearing these facts? That's part of the problem. I mean, it's like, yeah, there's a lot to unpack. You know, you've referenced a lot of it and a lot of it's in the record, of course. And then, of course, I outlined some of it in the brief, but it's all over the place. And I think this is one that really compels another review by another jury, especially in light of now what we had back then 20 years ago and what we have now. And, you know, this idea that, well, you know, especially if you're going to consider what witnesses said at a pre-trial hearing versus what actually what the state theorized at trial and who they called to support that theory. First of all, when it comes to this idea of accountability, they didn't call anybody. They just relied on no statement. You know, I agree, you know, everything the court cited. And, of course, addressing the context of, as I recall it, there were two big evidentiary issues that were raised, one of which was the circuit court's ruling denying the admission of ransom statement, which, I mean, certainly, you know, and then the statement from Antoine Chapman. So, and, of course, then there's witnesses that testify in the context of pre-trial hearings. But, like, now, the way that the case worked and what ultimately became a trial, which is, again, primarily almost exclusively the idea that he was one of the two government that came out and, you know, or not came out, but fired from a moving car. And this whole idea of accountability, basically just based on a statement, nothing more, just based on a statement that he was sitting in the car with a .38. And I think the statement is brief, even suggests, if not outright says, that one of his guns, that he's also accountable because it was a two-gun case and one of his guns, or the gun that he had was one of the two guns. Okay. But really what it amounted to was it was all almost exclusively he was guilty as a principal because he was shooting out of the front passenger seat of the moving car. And, oh, by the way, he don't believe that jury. Well, then he also told police that he was in the car with a .38. That's it. That's it. So, I do think... He was in the car with a .32. Yeah. Well, he's a .32, .38. I think there was a little dispute as to which one, but in any event, this idea that somehow, that wouldn't make a difference now if a new jury heard and heard all of this again, and if the state chooses to give, you know, to treat accountability more seriously and calls whatever witnesses they think that would support that theory, because certainly this idea that he's just was lured into... I don't know if he's lured. That's too strong a word. But he was ordered to get in the car, and he gets in the car and does nothing else but writes around the guys. He's the youngest of the group. That's 15 years old. Ransom himself says he wouldn't participate. He was a little punk. But they ordered him in the car. I'm going to stop you here. We're at 32 minutes in your argument, and I've given you more time because, as you correctly point out, there's a lot to unpack. So I'll turn now to the lead, Ms. Thompson. Thank you, Harris. May it please the court, I am Assistant State's Attorney Amari Dawson on behalf of the people of the state of Illinois. The question before this court today is whether the circuit court's findings were such that when given the deference it substantially deserves, its finding was unreasonable, arbitrary, or not based on the evidence presented. Defendant is unable to show that Judge Clancy's findings were manifestly erroneous, or in other words, clearly evident, planned, and indisputable. And we ask this honorable court to affirm the denial of defendant's petition. Defendant's newly discovered evidence, especially as it related to witness recantations, was unreliable, incredible, and unaligned. Let's go to what... If we take out the reckless testimony at trial, all we're left with is Crudup. And she says she never saw a shooter. So why is Crudup a reliable witness, particularly since she said so many different things that just don't make... aren't consistent at trial? Well, Crudup has not recanted. I understand. That's what I'm saying. Crudup, if you're left with Crudup, then you have this testimony that makes no sense, right? She said she didn't see the windows down. She didn't see the shooter. So, and she was upset with Hill, right? Well, Crudup, that is correct. But what Crudup... Why did you say that she's reliable? We would say she's reliable because, as the court noted, Crudup did not have a bias towards Hill. Although... She did have a bias. We know that she had an argument and she was no longer dating him. It was said that it was a bad argument. It's in the record, right? It was a bad argument. And she was very upset. Crudup was very upset that she was dating somebody else at the time. That bad argument... Young girls, don't forget, these are 14-year-old girls who had a wayward home and involved with gang members, right? And drugs and tattoos and so forth. I mean, it's a sad situation. But they're young girls, very impressionable young people. And we have certain rules and laws regarding young defendants, such as Hill, who was 15, just a year older than they were. Yes. Crudup did testify, however, that Hill was seated in the front passenger seat of Wilson's vehicle. He did. He did. But Hill says he told the officer, the officer testified at trial, he was in the back seat behind the driver. Correct. But that's a self-serving statement. That is an argument. Because he said it, but it's not self-serving if she says she didn't see the shooter. How does she know he was in the front seat if she didn't see? She said, I didn't see. She didn't see him fire the gun, per se. However, circumstantially, she saw him seated in the front seat of the vehicle the first time it slowed down and when it came back around the block. She heard the shots, and she saw sparks coming from that front seat after she said that he was seated in that seat. Not only did she say it, but Ratliff also stated the same thing. But Ratliff's testimony is, she said she lied, OK? So you can't, you know, whether or not she saw Hill in the front seat and shooting. We're left with Crudup, who had it, and she said there was a bad argument. And we have Vincent saying it was on foot. We have Davis saying it was on foot. And we only have these two people saying, one, Ratliff, who said, I lied. I did not know anything. I was at a birthday party. I was at my house. I just heard this. I was told to do this. I did what I was told. And then you had Crudup, who said she had no reason to lie. It doesn't make sense under the circumstances when even if you have to say her testimony does not make sense. I mean, she talked, she said different things to different questions that are consistent. Well, defendant did say that he was in the back seat of the vehicle. However, defendant did place himself with a revolver. There were two revolvers used in this circumstance. Defendant told the detective that he had a .32. The ASA said he had a .38. Significantly, however, defendant told police that Wilson had a gun or that it was a larger revolver and a smaller revolver. He had the smaller revolver, and he gave the revolver to Wilson according to his own statement after the shooting had been completed. And the physical evidence showed that there were casings from a smaller and a larger revolver. Oh, wait. What were the casings? It was a .44 casing, a .38 casing, or a .357 magnum casing. And Hill said he had a .32. So, Hill's gun apparently was not shot because the casings were .44, .38, or .357 magnum. That was a testimony of the police. Correct. However, there were two casings, I believe, that were found outside of the vehicle, and they said that they could have come from the same class of weapons, the .44 family. However, they weren't sure which revolver. There was no evidence that anything came from a .32, so you're saying the same thing. Correct. However, there's a point where he says he has a .32. There's another point where he says he has a .38. So, there's no definitive answer whether it was a .32 revolver or a .38 revolver. The police officer testified to a .32. That's what Dietz said. Correct. And the ASA testified that it was a .38. So, who knows? And that's the point. The point is, who knows? And we have a 15-year-old punk, as he was described by Ramson. And the fact that he would call him a punk might indicate something that he was not involved. Ramson said he was not involved. He was found guilty. Found not guilty, but he was... So, he had no reason to say that. What... Well, there was... I'm sorry. There was specific findings that the trial court made in regards to Ratcliffe's testimony at the hearing, as well as the other two people who testified at the bench area hearing. And the thing that Judge Clampy emphasized, in particular, about Ratcliffe's testimony, once again, that recantation... During the hearing, she testified that she did not witness the shooting. However, she testified she had been with her mother that night at her grandmother's home, and that she was back by midnight. The shooting happened shortly before midnight, which placed her at the home. Also, that doesn't replace her on the street walking at the school. The fact is, she said, I lied. She didn't have to say all this. She came forward. Vincent came forward, what, 22 years ago, 21, 22 years ago, even well before she did. There's something that doesn't make sense here, right? We have two stories, on foot, in the car. We have people that are upset with another. We have gang members saying different things. And this is at a time where we have witnesses. The main two witnesses are these two young women, right? And so, to have, if Ratcliffe says, I'm wrong, if you believe anything Vincent said, then you would have to believe it. There's serious questions about what happened here. It's in the record. We have the two stories, side by side. And somehow, one jury said Ransom was not guilty, and the other jury heard the same evidence that Hill is, when all the testimony seems to be around Ransom and not around Hill. So, you know, maybe the lawyers are different. Maybe something happened in the translation. But now, we have this. And to say that just because it's 20 years later, that doesn't take away from the fact that it might be wrong, right? The recantations happen later. That's always the case. And people have conscience. And this woman changed her life. She really did, right? She changed her life. And Vincent has been very consensitive. So, you have, you know, forget Donahue for a moment. I'll put him away. Okay. I'm not talking about Donahue. So, if we just center on that. And the question is, at this stage, is there enough to put serious questions as to what happened here to raise these issues? Because she says, don't believe anything I said. And Vincent is very consistent. Again, they were walking. And we have Davis, who said they were walking. So, were the girls, did they make all this up or not? We don't know. We don't know. But there's a possibility here that something's going on. She says she made it up. Well, at this stage, we just have to, defending is unable to show that Judge Clancy's findings were manifestly erroneous. He cannot show the judge's findings were clearly evident, plain, and indisputable, especially as it relates to Vincent. Vincent, who was shot in the back of the head, says he's proud that he slumped down and shot it down. This is common sense. No one who is getting shot at is going to turn around and look at the person who was shooting. No, no, he doesn't have to be the person, but he said he was on foot. The important thing is not the testimony that he was shot at and didn't see the shooting. We know that. The important testimony is it was on foot. He's very consistent about that. And now we have somebody saying that car thing, not true, not true. I didn't see it. I didn't see anybody in the car. And we have Davis who said at the time, at the time, who went out the window, who called the police, at that time, it was people on foot. So, it seems that with that kind of evidence at this hearing, would the judge have to say to himself, wait a minute, what's going on here? Vincent was not consistent about the shooter being on foot. In his first affidavit after the trial, he stated that the shooter was on foot. And then he stated he didn't know if the shooters were on foot. In fact, when he was asked about why he didn't know if the shooters were on foot, he replied, two of the individuals shot me and the other were on foot or on feet. More importantly, Vincent named three people as the shooter. He named Tuck, Logan, and Knuckles. And then he said Knuckles was not a shooter. When asked why did he lie on Knuckles, he said, oh, I was mad at him. That in itself shows that he does not know who the shooters are. And he is simply incredible. Why doesn't it show that he was mad at Knuckles? I mean, why do we not believe the victim? I mean, he has no reason to want to lie now. I mean, if he said I was mad at Knuckles, and it's the same thing that Fred up was mad at him. I mean, people get mad. That doesn't mean anything. It does. However, this is not the second stage. This is a third stage hearing. The judge makes credibility determinations. Judge Clancy specifically found that the testimony at the evidentiary hearing by Vincent was not worth the paper that it was written on. He said, quite literally, he's all over the place. He goes to identify these three people as shooters. Then he says there are two shooters. And it just so happens that the two shooters are the same two shooters that Vincent named. We're not talking about Donnie. I mean, all of us have said that. Let's put Donnie, you have a say. I mean, I don't think. And it just so happens that Vincent completes an affidavit only after he meets the defendant once he's housed at Menard Correctional Facility with him. He's there convicted on his own five attempted murders. And he comes about to create this affidavit because he said he's been researching on how to do such. And they have a conversation, and the affidavit is completed. Judge Clancy, once again, emphasized how recantations are highly reliable. In the case of Morgan, which the state discussed in its brief, in Morgan, there were two eyewitnesses. One of the eyewitnesses told the court that the defendant was responsible for both of the murders the day after the murders happened. Some 18 years later, he recanted that testimony. When he recanted the testimony, the other eyewitness had died. And although he stated now that defendant, one of the victims may have killed the other victim, and the defendant acted in self-defense, and that the police cursed him to the trial testimony, the defendant argued, importantly, in that matter, as the defendant argues here, that the new testimony would be consistent with the physical evidence, i.e., in this matter, being shot from the back window, Vincent being shot. However, the court noted in Morgan that neither witness was independent in the matter, and that the police and the assistant state's attorney rebutted the coercion that the testimony was coerced, as so did the state's attorney and the investigator. Yeah, but in this case, that is not an issue in this case. Let me ask a different question. Doesn't accountability require more than mere association? Doesn't it have to be some kind of shared intent or advanced planning? Accountability does not... More than mere association. Mere association is not enough for accountability. Okay, so what evidence is there of more than mere association? What the accountability instruction was given. This case was presented... My question, my question, what evidence is there of more than mere association? That the defendant was accountable? Yes, you said it was more... I agree with you. It's more than mere association. But what evidence was there that it was more than mere association? What is the evidence? The defendant was armed with a gun as well. He was placed... He placed himself at the scene in the car when the shooting occurred. But he said he didn't shoot. I mean, yeah, he was there, but what's... His association has to be with the other people. Just because he was armed, you know, he said he was armed. I mean, he was very forthcoming. I mean, really, right? He was very forthcoming. He didn't have to say that. He said he gave the gun to Wilson, I guess, and Wilson had the gun when he got out. And he went home, you know, and nobody talked to him for a few months. So again, what is it? What evidence of something more than mere association? What did the others in the car do? I mean, anyone could get into a car. Gang members come by. He's a member of a gang. Anyway, he says he's not a member of the gang, okay? He says he's not a member of the gang, but they invite him in, they know. He gets in the car, he sits down, and a few minutes later, there's this shooting, okay? So where is the more than mere association? I'm just... What facts? What evidence? The fact that Crudup, who has not recanted, stated that he was in the front seat of that vehicle when she saw Sparks and heard a gunshot. Right, and he said he was in the back seat behind the driver, and we also have testimony that she was extremely upset with him at the time. They just broke up a week ago, and she, according to the testimony, wanted to get back at him. So there is a reason that she did that, and there's a reason Radcliffe went along. Yes, however, this testimony or this evidence was presented to a jury, and the jury weighed the evidence and found that defendant was accountable when everything was taken into account. Maybe in retrospect, though, at this point, there doesn't seem to be any evidence of that, and when you add everything up, it seems that there's a lot of questions here that need some before this... I mean, he's no longer... My understanding is he's not on parole anymore. He's out, but this is still part of his life and his legacy, and he says, I didn't do it. I'm innocent, and he's been saying that. He's been saying it even at the beginning when he talked to the officers. He said, I'm innocent. He never has changed his tune that he's innocent. Now, he was convicted. I understand that, but now we have two affidavits, and we have a hearing, and the question is, yeah, did the judge do right? We can look at the third stage and decide whether, based upon what happened, that decision follows the law. The defendant's newly discovered evidence is not such of a conclusive nature. That's a result upon retrial, and that's the bottom line. Well, it's not conclusive because... It doesn't have to be conclusive, right? It doesn't have to be conclusive. Correct, of a conclusive nature. It doesn't have to be a conclusive nature. Because what we have here is Vincent Ratliff and Donahue. Nothing that they offer will probably change the result on retrial. That's what we just were talking about. Which, if she says, I lied, and testifies to what was going on there, and Vincent is consistent, Daniels, there's a lot of things, the gun being the 32, that can all be checked out, the bullets, there's no evidence that there was a 32 bullet. I mean, there are questions of innocence here. And I understand it's very difficult. These cases are very difficult, and they're very much attuned to the facts of the case. You would agree with that, right? Yeah. Every case is a little different. So it's hard to compare cases and other situations to here. So we have to really look at what's going on here. Is enough raised here to question whether that verdict should be reexamined? No, no. In light of the new evidence, which the state, you concede it's new evidence. So we know that. You're just saying, well, it's not enough. I don't know what enough would be under your, what would enough be? What do you have to say? Well, first of all, we know that Ratliff is incredible during this testimony, during the evidentiary hearing. Why do you know she's incredible? Well, first, Ratliff, as a child, testifies that she was there. During the affidavit, she testifies that she's not. However, when she's testifying at the evidentiary hearing, she wants the court to believe that her roommate, Regina Bedgood, told her what happened. Then she states that Crudup told her what happened. Then she states that Crudup told her and Regina what happened. And although she tried to remove herself from the scene, it's evident that she was there at the time that the shooting occurred. That's not what she said. Why isn't it possible? Why isn't it possible that, I don't understand how you come to that conclusion. Two people could tell her that. Where does that mean that she was there? Two people, she says, two people told me what happened. And you say, well, that means she was there. I don't understand that. How do you jump to that conclusion? Well, in the affidavit, she stated I was not present when the shooting occurred. I was at my grandmother's house with my mother and my brother. However, when being questioned during the hearing, when she stated, well, were you home before or after midnight? She stated I was home before midnight. The shooting occurred before midnight. She said, I saw the police. I looked out of my window. I saw the police there. So she was there. No, she wasn't there. Where is there? She was home. Yes. You just said she looked out of her window and she saw the police. Yes. That proves she was home, right? That proves that she was at the scene. Not the scene. The scene is not her home. She was in her home, she said. Just like Davis was in her apartment. Correct. She said that she was at her home. If I misspoke, I didn't mean to say that. The scene would be where the cars were, where the shooting took place. It was a different location. She wanted to remove herself. And the main thing is she tried to, I'm sorry. And she acted as though the story that she testified to, can you hear me? My internet connection is unstable. I can hear you. Okay. And she testified that she got the story from trial from the ASA, Petrakis. However, Petrakis rebutted her testimony. And in fact- She remembers. Petrakis doesn't remember. However, Radcliffe did testify to one thing that was important. When she spoke to Petrakis, Petrakis told her to testify to the truth. So- Regardless of how many times- That doesn't matter. As lawyers, we do that all the time, right? Every lawyer tells a witness that so they're covered. Yes. And yes, he told her that. And she didn't. She's saying now, she didn't have to come forward. She didn't have to fly from Tennessee to Chicago to testify at this hearing. She didn't have to do that affidavit. Other people didn't. She did that. She is putting herself out there. Why? Why? Because she knows that something is askew here. And all Hill is asking for is there's so many things going on here that don't make a lot of sense. And shouldn't there be a trial as a result of that? Because what you're left with when you take out her testimony is contradictory material. Well, after Radcliffe completed the affidavit, investigators from the Cook County State's Attorney's Office tried to speak to her. They called her on multiple occasions, set up Zoom meetings with her, and she evaded them. They were trying to find out, in fact, if her affidavit was credible. Well, she had an opportunity to examine her at the hearing. So that doesn't matter. She doesn't have any obligation to talk to them. No, she does not. What does matter is when she testified at the evidentiary hearing, that Judge Clancy found that she was incredible. Right, but maybe that's what one of the issues before us is whether Judge Clancy found that to be correct. Maybe that isn't based upon what is in the record. Maybe Judge Clancy is wrong on this. That's an issue before us. Well, here, we're just, defendant is unable to show that Judge Clancy, if he did make an error, and I'm not saying that he did. I don't believe that he did. The state does not believe that he did. But any alleged error must be clearly evident, plain, and indisputable, and there's no such error here. There's nothing that's clearly evident, plain, or indisputable. Judge Clancy found that all of the witnesses at the evidentiary hearing were simply incredible as it related to Donna Hugh and Ratliff, and he gave reasons for such. His reasons were, his reasons, he spelled them out in the record, and as it refers to Ratliff, he specifically stated once again that these recantations are highly unreliable, that she could have been there, and importantly, what we didn't discuss earlier, when she was at trial, not only did she testify, but she used demonstrative evidence when she testified, and that her testimony was very detailed and corroborated. And he said, in fact, the details at trial that she gave undercut her current testimony at the evidentiary hearing, especially where the physical evidence, specifically the shadowing on the victim's car, was corroborated by her trial testimony. And she confirmed that she and Crudup had a discussion, and Crudup has not recanted. So what? That's not the issue here. We're not talking about Crudup. We're talking about Ratliff and Vinson. Correct. We are. And as it refers to Vinson, Judge Clancy emphasized again that this is, again, a recantation, and that during the 1994 investigation and both trials, as the same with Ratliff, they testified not on one occasion, not on two occasions, but at least three occasions that Ratliff, that testified three times that he was a shooter or that he had a gun, he was sitting in his seat, she heard a gunshot, she saw the sparks. Vinson testified on at least three occasions he didn't see a shooter because he was... But that's the issue because he's not saying he didn't see... He still says he didn't see the shooter. He just says he heard footsteps and it was somebody... It was not from a car. It was from people. And with regard to Ratliff, she's saying, I lied. She lied once, twice, three times. Yes. Every time she lied. Yes. That's what's being said today. Yes. And you're just saying, just because they're changing... She's specifically changing her testimony. She said, I lied. No, people don't do that, independent. She has no reason to come forward. Well, there's nothing that I can say. I know. I mean, she's got a new life. She's in a new city. She has a tremendous job. She's really turned her life around. She should be commended for coming forward. So, I mean, the fact is, yes, she recanted. Yes. That's the issue. It's always difficult. It's a very difficult case. I can see it. It's very difficult. In these cases, they're always difficult. So the question is, does it deserve a new trial? At this juncture, that is there enough question as to whether he'll shot somebody? And have he... Well, then he's accountable. You haven't yet told me any evidence that shows accountability other than the mere association. So we're left with a very difficult question. At this juncture, the newly discovered evidence is not enough to undercut the evidence that was found at trial. They're simply incredible. And Radcliffe has remained his friend throughout the time since the shooting. Is there evidence of that? I thought that there was testimony that she maintained contact with the Hill until she moved away back in 1995. Yes, that is the testimony that she remained friends with him, and then she moved away in 1995. Just because you move away does not mean that you end your friendship with him. I just wanted to clarify, there's not testimony or evidence that, in fact, they have been in contact this whole time. No, there's no evidence as such. Ms. Dawson, we are at 32 minutes as well. Again, I'd like to unpack. Mr. Gonzalez, five minutes. Mr. Gonzalez, before you start, can I just ask you something? What about these specific, detailed credibility findings of Judge Clancy? We are here as the reviewing court. So from this conversation, there's a lot of points to be made about, well, if what Radcliffe is saying now is in fact true, that could be really meaningful to a second jury. But we didn't hear Radcliffe testified. We are the reviewing court, and we have a judge who made very specific findings. How are we supposed to deal with that? Because it's manifest weight. These factual credibility findings are to be given great deference and to be taken as true. So if we take it as true that all three people, Vincent, Radcliffe, and the other one were incredible, like Clancy said, how do we deal with that? You're on mute. Thank you. Sorry about that. Yeah, the idea that the standard at this point is one of deference doesn't mean that it's just either rubber stamped or that somehow we don't consider what the witnesses say or the importance of what they say. And with respect to Radcliffe, again, I think it's highly significant that her testimony was primarily dismissed simply on this idea that, well, just because it's a recantation, therefore it's unreliable, and the time frame of 20 years. But that's really, if that's it, I think, as Justice Hyman pointed out, yeah, a lot of these cases, they kind of, this is how they evolve, and that's how cases convictions get overturned over time. And sometimes, yeah, it takes years, and sometimes they happen because of recantations long after the fact. So just the fact that that's a recantation, and the court's just going to dismiss it out of the hand based on that, I think that's not a be-all, end-all. Neither is the 20-year time frame. I mean, there's one thing that Radcliffe was consistent on is that her trial testimony wasn't true. And again, I think the fact that she went through all of the expense and the effort to be there, and even reluctantly, at a time that she- Did Radcliffe explain at the event you're hearing why she did not give true testimony at the trial? No, I don't think she explicitly went over, I don't think she was asked as to why, as to the why part. But again, as far as the evolution of her life, yeah, this is one of those rare, it's not too often we see a recanted witness like this. So the degree to which she turned her life around and successfully adulted, and is adulting, and her kids in top colleges, that just makes her more credible. This idea that somehow it's just because she's coming forth 20 years later, and that she's- Because it's a recantation in and of itself. I just don't think we stopped there. And I think that at the end of the day, for all of the reasons, just as I'm in discussion with the state's attorney, I mean, we go on and on. I mean, all the questions that are raised by this case, they're just too numerous. And at the end of the day, the ultimate question is whether or not the new evidence puts the old in a completely different light and undercuts confidence in the outcome. Mr. Gonzalez, I keep hearing this theme that she came forward as an unrelenting witness. How did she come forward? Who went chasing her? Are we sure that she's doing this out of the conscience or because she's turned her life around? Or is she doing this because somebody told her she has to do this? How do we know? Tell me more about this reluctantly coming forward. The record doesn't speak to exactly how she got from point A to point B. I think what is evident from the record is that she didn't want to be there, that she was subpoenaed and that she used some of the discomfort that was described. And I guess whether it's described as combativeness or just reluctance. I mean, I think... And isn't it fair to think Judge Clancy too recognized that and thought, this is a person that wants nothing to do with this case and therefore is here saying, I wasn't there. I didn't see it. Just like she did the first time. The first time when she was 14, she said, I didn't say anything because I didn't want anything to do with this case. And now this is a person who has seemingly turned her life around. She's got a great future ahead of her and her children. And she's saying, I don't remember saying I wasn't there. Again, she didn't want to be here. It wasn't like she came forward and said, my conscience got to me and this person was convicted because I left. This is somebody saying, I remember I wasn't there, but I don't remember picking somebody out at the final. I don't care that 20 years later, you're always going to remember picking somebody out of the line. And she said, I don't remember that, but if I did, I only did it because of facts. So then there's a whole bunch of explanations. I'm not judging her credibility because that's not my job on review, but Judge Clancy did. And it was more than just saying 20 years passed and these are inherently unreliable. He went through pages and transcripts as to why each witness was unreliable. And so I'm just saying to you, again, there's some points to be made here about what she's saying now, but it's only really material and could possibly be conclusive if it's credible. And we have that first set of eyes in the hearing from Judge Clancy saying it's not. This court can also review that. Again, just because it's a deferential standard doesn't mean that we give no review at all. So how do we do that? Because we overturn credibility findings if they're not based on facts and evidence. And this was purely based on facts and evidence. She went through in great detail why he found her not credible. And all of that is supported by the record. And that's the standard as far as they know. If it's supported by the record, which it is, then we have to honor it. If it came out of a full cloth and he just made up things, then of course not. We're not going to just accept that. So I'm trying to really understand this, like how we could get past this fundamental issue about these credibility findings, manifest way to the evidence, before we get to the second step. Because I feel like we're getting ahead of ourselves before we're really honing in on what the standard of review. I'm going to answer that in two parts, and hopefully it answers the question. I'll try to answer as directly as I can about the idea as to, you know, of course you get conflicting evidence at trial. And of course there's some conflict in what she said between her affidavit and her evidence or hearing testimony 20 years later. But it's one thing to do what she did as a 14-year-old. And to say, for example, as a 14-year-old, I just didn't want to be involved. Versus now 20 years later as a successful adult living out of state, going through the extra effort of, you know, the airline tickets and disrupting her life and all of that stuff as a responsible adult, to come forward and testify the way she did. I think the one thing that is consistent, even, you know, in her affidavit and at the evidentiary hearing, again, is what she said. I lied. He was not there. I did not see it. It did not occur the way I described it. So I don't see how that part of it can be dismissed. How about that inherent inconsistency? I wasn't there and he didn't do it. Well, maybe he didn't do it or I can't say he did it because I wasn't there. I guess that's a connection that I don't know, you know. Let me go back to something that you were asked by Justice Cameron. How did she get there? And the answer is the state. The state got her there. Richard Lombard, an investigator of the Attorney's Office, was assigned to the case in 2017 as part of the Conviction Integrity Unit. He's the person who interviewed Vincent. He testified at all this at the hearing, the third stage hearing. Lombard interviewed Vincent at Menard Penitentiary in 2018. I won't go through that. He also interviewed Donahue in 2018. And in 2020, Lombard contacted Ratcliffe. So the state is the one that contacted Ratcliffe in Memphis. And Ratcliffe initially agreed to an interview with Lombard via Zoom, but she stopped returning his phone calls. So, former ASA Peter Patakas testified that he was the lead prosecutor in the case. He, Ratcliffe's number, told him that she did not actually witness the shooting. We know that because she says now she lies. But in any event, how she got involved in this was through the state. So that's the answer to that. Thank you. There was another thing that came up too that's in the record. Ratcliffe had some kind of case involving a lawyer who was in, Patakas was in private practice and he was involved in it. And then she met him again. He didn't remember the case at all. He didn't remember her, but she remembered him. And that also made her start thinking about this as well. That's what she said. Correct. And thank you for reminding me of that because you're right. It came back to me. It's a, what do you call it? A conviction integrity. So it started out around, I want to say 2017-ish, somewhere in that timeframe. And then it evolved into where we got to, the denture hearing, all that stuff. And then Ratcliffe at some point just decided, I'm not talking to these guys, to the prosecutors. Okay. As you said, she was a reluctant witness. Yes. Oh, for sure. Yeah. And it was pretty evident. It was pretty evident. And I know the state makes much hay about the combatants and all that, but again, I mean, that's not surprising. She didn't want to be there in the first place. But she did. Thank you, Mr. Gonzalez. We are well beyond our time. I appreciate Gonzalez's advocacy, both by Epelante and Napoli. The court will take the case under advisement and issue a decision in due course. Thank you, Your Honors. Thank you.